JAMES H. KENNERLY

*v.*

GEORGE H. ALECK et al.

[Submitted April 24th, 1916.   Decided June 26th, 1916.]

Specific performance will not be decreed of a contract which fails to express the true agreement of the parties, when such failure was brought about by the efforts of the complainant to overreach the defendant.

*Mr. Wilfred B. Wolcott,* for the complainant.

*Mr. J. Charles Winters, Mr. Samuel K. Robbins* and *Mr. C. Oscar Beasley* (of the Philadelphia bar), for the defendants.

BACKES, V. C.

This is a bill to compel the specific performance of a contract to convey a farm of one hundred and sixty acres, known as the "Cooper Homestead," in Camden county.

The title to the farm is held by the defendant, Aleck, in trust for the defendant, Helen C. Douglas. They agreed to sell it to the complainant, and on November 7th, 1914, Aleck entered into a written contract with the complainant, which was witnessed by Mrs. Douglas, wherein he agreed to convey it upon the following terms:

"The said party of the second part [complainant] agrees to pay for the said property the sum of one dollar, as follows: One dollar on the execution of this agreement, and agrees to take the property subject to a mortgage of $3,800.00 now existing on the property, which mortgage draws six per cent. interest, and also subject to a mortgage of $36,200.00, which mortgage shall be created in the name of George H. Aleck, trustee for Mrs. Helen C. Douglas. This said second mortgage to draw an interest of $1,200.00 a year payable monthly in the amount of $100.00 per month, and subject to foreclosure in case of a default of six months on any one month's installment. Said party of the second part agrees to pay off the mortgage of $3,800.00 within two years. * * *

"The said parties hereby bind themselves, their heirs, executors and administrators, for the faithful performance of the above agreement within thirty days from the date hereof, said time to be the essence of this agreement, unless extended by mutual consent in writing endorsed thereon. * * *

"Party of the second part agrees to pay $1,000 per year on the second mortgage after five years from the date of the mortgage."

It is a very unusual contract. The parties are all beyond middle life, and can hardly expect to live to see its fulfillment. Payment of the last installment of principal is forty-two years off, and the purchaser is required to pay interest at the rate of $1,200 a year down to that time, even though the last installment amounts to but $200, aggregating a sum slightly in excess of legal interest, if interest were calculated upon the consideration price of $36,200, allowing for deductions as payments are to be

made. Peculiar as these features of the bargain are, they nevertheless were so understood and agreed to by the parties. It will be observed, however, that the contract makes no provision for a bond to be given for the purchase price, and does not disclose, except, perhaps, by implication, who was to make the mortgage. This is not according to the agreement. The defendants executed the writing, in the confidence that it correctly embodied and expressed their arrangement with the complainant, viz., that he was to pay $36,200 for the equity in the farm, upon the terms stated, and give his bond for the debt and a mortgage to secure it. They assumed, as they had a right to, inasmuch as the complainant agreed to pay for the farm in deferred payments, that the word "mortgage" in the contract spelled "bond and mortgage." The omission of all reference to a bond, and the ambiguous language as to the mortgage, were by design of the complainant, and covertly, to evade personal liability. Mr. Ellis, complainant's counsel, who drew the contract, testified that he told the complainant

"that it would not be advisable, in taking a big mortgage of that kind, to take it in his name and give a bond, and suggested that he have a straw bond and mortgage made, and he [complainant] said that they had finally agreed, as I remember it, that he would give a mortgage and no bond in connection with this and that would obviate the difficulty or the possibility of his having trouble with the bond later on in case anything should happen to him or his estate."

Mr. Ellis also proposed the straw bond and mortgage plan to Mr. Aleck. The complainant, who preceded his counsel on the witness-stand, asserted indignantly that he had never heard of such a thing as a straw bond, but the language of the agreement, "and also subject to a mortgage of $36,200, which mortgage shall be created in the name of George H. Aleck, trustee for Mrs. Helen C. Douglas," is so accommodating to the "straw-man's" scheme, that I am compelled to reject his disclaimer. Moreover, the complainant's statement to his counsel, as his counsel testified, that the defendants had agreed that he should give a mortgage and no bond, whereby he would escape personal liability, was not true. The complainant did not deny his counsel, nor did he affirm the truth of the alleged statement to him. The

defendants say that there was no such agreement, and I believe them. The fact that counsel prepared a deed and mortgage, but did not draft a bond, adds confirmation that the representation was made to him by his client.

Now, what position does the complainant occupy in asking a court of equity to enforce such a contract? The written contract itself may not be lacking in that mutuality which defeats specific performance, and the giving of a bond at this time (as the complainant proposed at the hearing) might fulfill its requirements, as counsel argued; but that is wholly aside from the question. Were the agreement unwittingly couched in the inartistic style of the present writing. and the appeal·for its enforcement made by a suitor otherwise candid, it is quite likely that a construction would be given to the contract which would carry into effect the intention of the parties. Here, however, the inherent vice in the transaction, which stays the arm of the court, is that the complainant attempted to overreach the defendants, and by subtle and cunning artifice endeavored to obtain an undue advantage. His studied efforts were to secure a contract binding·upon the defendants, without incurring a corresponding obligation. Specific performance rests in the sound discretion of the court, and to contracts procured by such sharp practices equity courts turn a deaf ear. In *Rodman* v. *Zilley, 1 N. J. Eq. 320*, Chancellor Vroom said: "Courts of equity seldom interfere to set aside sales and contracts, on the ground of inadequacy of price. They leave the parties to their legal remedies. But when they are called on for extraordinary aid to enforce a contract, they take the liberty to examine into the consideration to be given, its fairness and equality, and all the circumstances connected with it. And if anything manifestly inequitable appears in that part of the transaction, they will never lend their power to carry the contract into execution." And in *Crane* v. *DeCamp, 21 N. J. Eq. 414*, Mr. Justice Scudder, speaking for the court of errors and appeals, said: "There is no rule in equity more clearly established than that upon an application for a specific performance of a contract the court must be satisfied that the claim is fair, reasonable and just, and the contract equal in all its parts. If these points are not estab-

lished by the complainant, he will be left to his remedy at law (citing authorities). In judging of the fairness of a contract, the court will look not merely at the terms of the agreement itself, but at the relations of the parties and all the surrounding circumstances." This doctrine was reiterated by the court of errors and appeals in *Worth* v. *Watts, 76 N. J. Eq. 299.*

The defence set up by the answer is that the complainant abandoned the contract, in that he failed to perform it within the time expressly limited. The agreement binds the parties to a faithful performance within thirty days of its date, and time was, consequently, of the essence of the contract. *Collins* v. *Delaney Co., 71 N. J. Eq. 320.* On the day the contract was signed, Mr. Ellis, complainant's counsel, was instructed to prepare the transfer papers. Three days thereafter, the complainant says, he requested Mr. Aleck to sign the newly-drawn deed, and that he refused, saying that "he had read over the agreement; that it was the biggest fool agreement he had ever read; that Mr. Ellis was a fool, and that he would not sign it." His brother corroborates him. He also testified to repeated demands and refusals thereafter. On the other hand, the defendants say that during the time specified they stood ready to perform—that is, upon the execution of a bond and mortgage, according to the agreement as they understood it; that they heard nothing from the complainant until the following January, except a telephone message in November or December, saying that he had not sold his Media farm, and took it for granted that he was unable to carry out his agreement. That in the month of January the complainant opened negotiations for a lease of the farm, and, after many meetings and much discussion, one was agreed upon and drawn in a Mr. Speiss' office, a real estate operator in Philadelphia, on February 2d, for a term of five years. The complainant at this time wanted an option to purchase, offering to pay $45,000— an advance of $5,000 over his former bid—which the defendants say they declined to give him. The lease was not executed, because the complainant was not at the time prepared to pay the first installment of the rent, as the defendants demanded, although, according to the terms, it was not payable until the following April. He promised to make payment within a day or

two, and failing in this, the defendants declined to further treat with him, whereupon he tendered the installment in cash, which was refused, and then for the first time he declared his intention of enforcing the sales agreement.

The decision on the phase of the case we are now considering hinges upon whether the complainant was ready and willing and offered to perform within the time stipulated; and while upon this point the testimony of the parties is in irreconcilable conflict, the attending facts and circumstances leave little doubt as to where the truth lies nearest, and they persuade me that it is not with the complainant. According to the complainant, the first demand he made for an execution of the deed was three days after the agreement was drawn. Now, at that time the title had not been searched, and the mortgage which was to be given was still in the course of preparation. The stage had not been reached for closing the deal, according to common experience in such matters, and there was no occasion for making a demand, and to my mind it is decidedly improbable that one was then made. If the complainant is not to be believed in this, no reliance can be placed in his assertions that repeatedly and constantly thereafter he made demand. This incident appears to have happened at or about the time of the supposed first demand and refusal. Mr. Aleck related to the complainant Mr. Ellis' suggestion of a straw bond and mortgage, and characterized the lawyer as a fool, and it is quite possible that the complainant has since fancied that occurrence into a.repudiation of the agreement. Mr. Aleck's attitude toward the proposal may also account, in a measure, for the complainant's indifference thereafter to the contract, realizing, as he must have, that personal liability for a large amount would be at stake if he pressed for performance.

The controlling reason why the complainant allowed the contract to lapse was, it seems to me, that he did not want two farms on his hands at the same time. When he entered into the present arrangement, he owned and operated a farm at Media, Pennsylvania, for which he had prospective buyers, and from the sale of which he had planned to put up, on the Jersey farm, a necessary and costly barn or cattle-shed for his live stock. He was not able to sell for two months, and in the meantime he telephoned

Mrs. Douglas, informing her of his predicament. In January, and doubtless after he had sold his farm, the complainant called upon Mr. Ellis and told him that he thought Mr. Aleck would now sign, and had him erase from the deed prepared in November the month and year of November, 1914, and insert January, 1915. What made him think so? Absolutely nothing happened at that time to warrant the statement. The complainant himself emphatically asserted that from the beginning Mr. Aleck denounced the contract as a fool agreement and was unalterably opposed to signing the deed, and the only inference to be drawn is that then, and not until then, was the complainant ready, and that he still hoped, after his long delay, to obtain a favorable consideration.

That the complainant purposely allowed the time for performance to expire, and that he fully realized that whatever rights he may have had in the contract were gone, is further borne out by his later conduct. Why should he, if he had, or thought he had, an enforceable agreement, negotiate for a lease of the farm with an option to buy, at an increase of $5,000, as he admits he did? I take no stock in his explanation that he did it to avoid "a law suit and other troubles." He evidently had little or no dread of litigation, as is manifested by the present controversy, and it is altogether unlikely that he was prompted by pacific motives to offer so large a bonus for peace.

Faith in the complainant's veracity is further shaken by his testimony concerning the negotiations for the lease. He says that the matter of the lease was suddenly sprung upon him by the defendants in Mr. Speiss' office, where, he says, he went at the request of the defendants, not knowing what he was going there for. This is disproved. The parties had been dickering quite some time, and by appointment went to the agent's office to have the lease drawn; and it abundantly appears that there was much discussion of the subject on many occasions before that event.

The complainant also testified that it was agreed that he should have with the lease the privilege of buying at the price of $45,000. It is clear that in this he was not truthful. Mr. Speiss' testimony is convincing that the complainant's offer for

an option was peremptorily rejected. He is corroborated by the
defendants and supported by the draft of the lease which makes
no mention of one. It seems hardly possible that the complain-
ant was honestly mistaken, for 'when the lease was prepared it
was read and explained to him and he was ready to sign it as
drawn, knowing that it contained no option clause. His eleventh-
hour shift, that the option was to be embodied in a separate
paper, is too weak to be credited. On direct examination he tes-
tified, and was positive, that the option which he said had been
agreed upon was incorporated in the lease. Upon a demonstra-
tion that this was not so, he was recalled in rebuttal and was
reminded, spontaneously, as he pretended, by suggestion in coun-
sel's question, that when he insisted upon the option being in the
lease, Mr. Speiss replied that he would not embody it in the lease,
but would draw a separate option and would have it ready when
he came to sign the lease. The proper and ordinary place for
such an option is in the lease itself, and no plausible reason ap-
pears why it should not have been thus incorporated if one had
been agreed upon.

The bill will be dismissed, with costs.